UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

In re:   THE DYNAMIS GROUP, LLC, *et al.*[1]

        Debtors                                   CASE NO. 09-34645
                                                              CHAPTER    11

NAJA, LLC

        Plaintiff

vs.

JACK'S COMPANY, LLC, *et al.*

        Defendants                                      Adv. Proc. No. 10-3030

**MEMORANDUM-OPINION**

THIS ADVERSARY PROCEEDING is before the Court after the conclusion of the trial on the merits of Plaintiff's complaint for declaratory and other relief.  Plaintiff's complaint seeks an order from this Court declaring that certain of the Defendants owe Plaintiff the sum of $1,800,000.00 plus costs, late fees, interest, penalties and attorney's fees; that Plaintiff has an equitable lien on all assets sold pursuant to the Asset Purchase Agreement (the "Asset Purchase Agreement") entered as of July 12, 2004 between Plaintiff, W.P.B. Oil Company, Inc. ("WPB"), The Dynamis Group, LLC ("Dynamis"), Molly Company, LLC ("Molly") and Helmick Oil Company, LLC ("Helmick Oil"); and that such equitable lien is superior to any other lien in such assets.  Plaintiff's complaint also seeks an order enjoining any of the Defendants from disposing of any of such assets.  Plaintiff's

---

[1] The bankruptcy cases of The Dynamis Group, LLC (Case No. 09-34645), Jack's Company, LLC (Case No. 09-34647), Molly, LLC (Case No. 09-34649) and Helmick Oil Company, LLC (Case No. 09-34650) are being jointly administered under Federal Rule of Bankruptcy Procedure 1015(b).

1

presentation of its case at the trial upon the merits and Plaintiff's pre-trial and post-trial briefs make it clear, however, that Plaintiff is at this time seeking only an adjudication that Plaintiff has a first priority equitable lien on the real estate transferred pursuant to the Asset Purchase Agreement for the unpaid portion of the $1,800,000.00 promissory note given by Jack's Company, LLC ("Jack's Company") as part of the consideration for the purchase of such property, plus costs and attorney's fees.  By virtue of 28 U.S.C. § 157(b)(2)(K), this is a core proceeding.  The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## FINDINGS OF FACT

Jack Helmick ("Mr. Helmick") wears many hats.  He is the sole member and manager of each of Debtor/Defendants Jack's Company, Dynamis, Molly and Helmick Oil (these entities are sometimes collectively referred to herein as the "Dynamis Defendants" and each entity is sometimes referred to herein individually as a "Helmick entity").  He is also Senior Vice President of Operations for Road Ranger, a direct competitor of the Dynamis Defendants.[2]  Moreover, he served as CEO of Plaintiff's affiliate, WPB[3], up through the transaction at question in this Adversary Proceeding.

Sometime during April or May of 2000, Mr. Helmick was assigned by his then employer, Thornton Oil Company, to assist WPB in reorganizing its operations.  Jim Thornton, Thornton Oil Company's CEO, had been a friend of the late husband and father of the shareholders of WPB.  WPB was at that time experiencing severe financial distress, and Mr. Thornton directed Mr. Helmick to help turn the company around.  Mr. Helmick took over the day to day operations of WPB.  Eventually, he and WPB's shareholders agreed that he should be hired as CEO of WPB.

As CEO of WPB, Mr. Helmick not only managed the day to day operations of the company, he managed WPB's accounting and controlled all of its financial information and projections. Once

---

[2]Mr. Helmick began working for Road Ranger in August of 2008, more than a year prior to the filing of Debtors' bankruptcy petitions.

[3]WPB owned and operated several gas stations/mini-markets on land leased from Plaintiff.

Mr. Helmick took over WPB, WPB's shareholders for the most part ceased their direct involvement in the company's affairs, with the sole exception of Jane Retamoza ("Ms. Retamoza")[4], who helped maintain relations with the company's creditors.

Ms. Retamoza, however, was not privy to company financial information and, being unsophisticated in business matters, lacked the means fully to understand that information anyway. She relied completely on Mr. Helmick's expertise and judgment in the running of the company.

WPB continued to experience losses and by around 2003 the shareholders wanted to sell the company. According to credible testimony by Ms. Retamoza, Mr. Helmick discouraged the shareholders from marketing the company to third-parties, ostensibly to prevent a "fire sale" situation, and instead proposed that he purchase the company's assets.[5]

During roughly the next year, up through July 13, 2004, Mr. Helmick worked to structure the sale transaction with Avery Matiney ("Mr. Matiney"), representative for Ascentia Bank ("Ascentia"), predecessor in interest to Defendant PBI, Inc., and David King ("Mr. King"), a loan broker. Two attorneys who shared offices, Bob Thieman ("Mr. Thieman") and Bill Barth ("Mr. Barth"), ostensibly represented Plaintiff/WPB and the Dynamis Defendants, respectively, during the sale "negotiations." The credible testimony of Ms. Retamoza and Mr. Matiney, however, shows that Mr. Helmick essentially controlled the negotiations for both seller and buyer. Plaintiff's members simply acquiesced to Mr. Helmick's recommendation as to what was the best outcome for all concerned.

Mr. Helmick, Mr. Matiney and Mr. King structured the transaction in the complicated fashion reflected in the Asset Purchase Agreement solely to enable Mr. Helmick and Ascentia to take advantage of loan guarantees from the U.S. Department of Agriculture (the "USDA"). In simplified terms, if certain criteria were met, the USDA would guarantee approximately 70% of the Ascentia loans that permitted Mr. Helmick's companies to purchase Plaintiff's and WPB's assets.

Most significantly, the USDA required that the borrowers have "20% equity," i.e., a 80/20

---

[4]Ms. Retamoza had only reluctantly taken over management of WPB following the death of her father, after a succession of hired managers proved incompetent.

[5]Indeed, almost from the beginning of his tenure at WPB, Mr. Helmick had expressed his desire eventually to own all or part of the company.

debt/equity ratio. In this case, however, because the borrowers had no assets prior to the transaction in question[6], certain of the assets purchased from Plaintiff and/or WPB would have to remain unencumbered, at least to the USDA's eyes. Accordingly, Messrs. Helmick, Matiney and King devised a deal structure in which certain of Mr. Helmick's entities, Dynamis, Molly and Helmick Oil[7], would pay a majority of the purchase price for the assets in cash borrowed from Ascentia on a secured basis, while a separate Helmick entity, Jack's Company, would give Plaintiff an ostensibly unsecured note for $1.8 million of the purchase price (the "Jack's Note"). The $1.8 million note amount was chosen because it equated to the 20% net worth required by the USDA. In other words, upon execution of the Asset Purchase Agreement and the related loan documents between Ascentia and the Helmick entities, Dynamis, Molly and Helmick Oil would collectively own substantially all of Plaintiff's and WPB's assets but would have encumbered only 80% of the value of the same–again, at least to the USDA's eyes. The maker of the Jack's Note, Jack's Company, would not have any assets and would not generate income of its own. Rather, the three operating entities, Dynamis, Molly and Helmick Oil, would provide Jack's Company with the funds necessary to pay the Jack's Note. Jack's Company would simply act as a conduit of funds from the other three Helmick entities.

The closing of the transaction took place on July 13, 2004. Subsequently, although a few payments were made on the Jack's Note by one or another of the Dynamis Defendants, Jack's Company ultimately defaulted on the Jack's Note. In late 2008, Plaintiff filed suit against the Dynamis Defendants in Jefferson County, Kentucky, Circuit Court alleging, among other things, default on the Jack's Note and breach of the Asset Purchase Agreement, and seeking, among other relief, recission of the Asset Purchase Agreement and return of the assets transferred thereunder.[8]

---

[6]Mr. Helmick testified that all of the Dynamis Defendants were empty shell entities prior to the transaction.

[7]Plaintiff's assets were apparently divided among the three Helmick entities in order to satisfy certain USDA geographic and/or jurisdictional requirements.

[8]The Court takes judicial notice of the unsigned copy of the state court complaint included in the record in the main bankruptcy case giving rise to this Adversary Proceeding. No party has disputed that Plaintiff filed suit in state court against the Dynamis Defendants with respect to the Asset Purchase Agreement.

At approximately the same time, Plaintiff recorded lis pendens notices (the "NAJA Lis Pendens Notices") regarding that suit and the property in question in the appropriate public records of several Kentucky counties.

Debtors filed their Chapter 11 bankruptcy petitions on September 11, 2009 and Plaintiff filed this Adversary Proceeding on April 16, 2010.

## CONCLUSIONS OF LAW

### A. Equitable Lien

The real estate issue presented in this Adversary Proceeding requires that the Court consider Kentucky state law. *See Butner v. U.S.*, 440 U.S. 48 (1979). Plaintiff asserts that under Kentucky law, specifically *Bolen v. Bolen*, 169 S.W.3d 59 (Ky. App. 2005), it holds an equitable lien on the real estate transferred in accordance with the Asset Purchase Agreement. In *Bolen*, the Kentucky Court of Appeals noted that "[l]ongstanding Kentucky case law is that as between vendor and vendee, a vendor has a lien on granted premises for the unpaid purchase money even if no lien was expressly reserved in the deed." *Id.* at 63. Plaintiff argues that the failure of Jack's Company and other Dynamis Defendants to pay the Jack's Note left the purchase money for the real estate unpaid, thereby giving Plaintiff a lien on the real estate for the unpaid balance.

The Dynamis Defendants, on the other hand, argue that Plaintiff in fact received full consideration for the real property–that the Jack's Note in itself constituted consideration whether or not it was ultimately paid. They also argue, alternatively, that *Bolen* does not apply here because the maker of the Jack's Note, Jack's Company, was not one of the record "vendees" of the real estate.

The Court finds the Dynamis Defendants' first argument unpersuasive and concludes that Plaintiff failed to receive full consideration for the real estate. In broadest outline, *Bolen* addressed the situation presented in this Adversary Proceeding. A seller agreed to sell real estate to a buyer in exchange for a promise of future payment, which was not made. While the Court will discuss below the ramifications of the differences in details between this case and *Bolen*, the fundamental point is that a promise to pay clearly does not constitute full and final payment of purchase money. In this regard, the Court also agrees with Plaintiff's reading of KRS 355.3-310(2)(b), Kentucky's version of Uniform Commercial Code ("UCC") § 3-310(b)(2), and Official Comment 3 to UCC §

5

3-310(b). Tender of a promissory note does not discharge the buyer's obligation to pay for the property but simply suspends that obligation until such time as the promissory note is satisfied. According to Official Comment 3 to UCC § 3-310(b), even if the maker of the note is a third party rather than the buyer, if the note is dishonored, the seller may sue on either the dishonored instrument or the underlying contract of sale.

The Court also finds the Dynamis Defendants' attempt to distinguish *Bolen* unpersuasive. The Dynamis Defendants focus on the phrase "as between vendor and vendee" in *Bolen* and argue that such phrase means that the equitable lien only arises where the vendee, as opposed to a third party, fails to make promised future payments. Here, they assert, it was a third party, Jack's Company, not the "vendee" that agreed to pay in the future and, therefore, *Bolen* does not apply.

The Court disagrees with the Dynamis Defendants' pinched reading of *Bolen.* By reading the cases cited by the *Bolen* court concerning equitable vendor liens, particularly *Commonwealth Life Ins. Co. v. Eline*, 119 S.W.2d 637 (1938) and *Starbird v. Blair*, 12 S.W.2d 693 (1928), it becomes clear that the court used the phrase "as between vendor and vendee" as an acknowledgment of the *statutory* requirement that the lien would not apply as between the vendor and third party creditors and subsequent purchasers without notice of the circumstances giving rise to the lien. *See* KRS 382.070 ("When any real property is conveyed, and any part of the consideration remains unpaid, the grantor shall not have a lien for the unpaid consideration against bona fide creditors and purchasers unless the deed states what part of the consideration remains unpaid.") In *Bolen*, the deed in question did not state what part of the consideration remained unpaid, so the lien recognized by the court there could only apply "as between vendor and vendee."

Moreover, this Court believes that, as a matter of equity, the proper focus in reading *Bolen* should be on the vendor, not the vendee, and the fact that the vendor failed to receive full and adequate compensation for its property. The fairest remedy in such situation would be to give the vendor a lien against the property, enforceable against the vendee and any other party taking an interest in the property with knowledge of the circumstances giving rise to the lien. In this Court's view, the operative fact is that the vendor, here Plaintiff, failed to receive full consideration for transfer of its real estate. Whether that consideration was to be supplied by the record purchaser or

6

a third-party[9] makes no difference from the perspective of the vendor.[10]  The vendor was deprived of a portion of the value of its property and equity must step in to redress the situation.

### B.  Lien Priority

Having concluded that Plaintiff holds an equitable lien on the real property in question, the Court must determine whether that lien has priority over Defendant PBI's competing lien.  As further discussed below, the Court concludes that Plaintiff's lien is superior to PBI's lien.

The Court agrees with Plaintiff's reading of *Tile House, Inc. v. Cumberland Federal Savings Bank*, 942 S.W.2d 904 (Ky. 1997), that an equitable lien has priority over a subsequent lien held by a party with actual notice of the circumstances giving rise to the equitable lien.  In *Tile House*, the Kentucky Supreme Court held that certain mechanics' and materialmen's liens were superior to the asserted equitable lien because the holders of those liens had no actual or record notice of the claim of equitable lien.  *Id*. at 906.  In contrast, the *Tile House* court treated as subordinate the lien of a bank that had actual notice of the circumstances giving rise to the equitable lien.  *Id*.  Thus, priority of an equitable lien in Kentucky depends on whether the subsequent lienholder had actual or constructive notice of the circumstances giving rise to the equitable lien.

Here, Defendant PBI obviously had actual notice of the circumstances giving rise to Plaintiff's equitable lien.  Its predecessor in interest, Ascentia, directly participated in the creation of those circumstances when its employee, Mr. Matiney, worked with Mr. Helmick and Mr. King to structure the transaction in question.  Accordingly, this Court must treat PBI's lien as subordinate to Plaintiff's equitable lien.

### C.  Lien Avoidance Under 11 U.S.C. § 544

Finally, the Court must determine whether Plaintiff's first priority equitable lien can nonetheless be avoided by the debtors-in-possession under 11 U.S.C. § 544.[11]  Here, the Court

---

[9] In this case a very closely related third-party.

[10] As discussed above, this is supported by Official Comment 3 to UCC § 3-310(b).

[11] In their memorandum in support of their motion for summary judgment in this Adversary Proceeding, which was incorporated by reference in their pre-trial memorandum, the

agrees that the NAJA Lis Pendens Notices served to place a hypothetical judicial lien creditor, execution creditor and purchaser of real property on notice of Plaintiff's equitable lien, thereby rendering 11 U.S.C. § 544 unavailable to the debtors-in-possession with respect to that lien.

First, it is clear in the Sixth Circuit that, under Kentucky law, a properly filed lis pendens notice places a subsequent purchaser of the affected real estate on notice of the interest asserted in the lis pendens and, therefore, a bankruptcy trustee cannot be treated as a bona fide purchaser of that real estate for purposes of 11 U.S.C. § 544(a)(3). *See Kendrick v. CIT Small Bus. Lending Corp. (In re Gruseck),* 385 B.R. 799 (6th Cir. BAP (Ky.) 2008) (unpublished opinion). In this case, none of the Defendants have asserted or otherwise provided any evidence that the NAJA Lis Pendens Notices were improperly filed.

Second, the Court agrees with Judge Allen's analysis in *Commercial Transp. Corp. v. Robinson Grain Co.*, 345 F.Supp. 342 (W.D. Ky. 1972) and concludes that the filing of a lis pendens notice also serves to "perfect" the property interest referred to in the lis pendens notice as against subsequent judicial lien and execution creditors. In *Robinson*, Judge Allen considered the meaning of the word "encumbrancer" in Kentucky's lis pendens statutes and concluded that the term "encumbrance" includes judgment liens, executions and attachments. *Id.* at 344-45. Accordingly, the filing of a lis pendens notice under KRS 382.440 serves to place subsequent judicial lien creditors and execution creditors–both "encumbrancers" under *Robinson*–on constructive notice of the interest asserted in the lis pendens and rendering their interests in the property subordinate to that of the lis pendens filer. Thus, a bankruptcy trustee's hypothetical position as a judicial lien holder or execution creditor as of the filing of the bankruptcy petition would be subordinate to the lien "perfected" previously by the filing of the lis pendens.[12] In this case, the NAJA Lis Pendens Notices were filed well before the filing of the debtors's bankruptcy petitions, rendering 11 U.S.C. §§ 544(a)(1) and (2) unavailable as against Plaintiff.

---

Dynamis Defendants asserted that any equitable lien of Plaintiff would nonetheless be avoidable under 11 U.S.C. § 544.

[12]The Court notes, of course, that the trustee might also be able to avoid the lien under a different provision of the Bankruptcy Code, such as 11 U.S.C. § 547. In this case, however, the NAJA Lis Pendens Notices were filed well outside the "preference period" set forth in 11 U.S.C. § 547 and none of the Defendants have alleged or provided any evidence of any other grounds for avoiding Plaintiff's equitable lien.

## Conclusion

For the foregoing reasons, the Court concludes that Plaintiff holds a first priority equitable lien against the real property transferred under the Asset Purchase Agreement. A separate Order consistent with the foregoing has been entered in accordance with Federal Rule of Bankruptcy Procedure 9021.